IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JEFFERY SARGENT ROBERTS,

        Plaintiff,                             No. CV-10-1530-HZ

    v.

                                           OPINION & ORDER

CITY OF BEAVERTON POLICE
DEPARTMENT,

        Defendant.

Jeffery Sargent Roberts
5005 Murray Blvd., #508
Beaverton, Oregon 97005

    Plaintiff Pro Se

Gerald L. Warren
901 Capitol St., NE
Salem, Oregon 97301

    Attorney for Defendant

1 - OPINION & ORDER

HERNANDEZ, District Judge:

Plaintiff Jeffery Roberts, appearing pro se, brings this action against the City of Beaverton Police Department. In his one-paragraph Complaint, he contends he was wrongfully arrested and incarcerated by officers of the Beaverton Police Department on February 7, 2010. Defendant moves for summary judgment. I grant the motion. After briefing on the summary judgment motion was complete, plaintiff moved to amend his Complaint. I deny the motion to amend.

BACKGROUND

In his Complaint, plaintiff contends that on February 7, 2010, at 1:15 p.m., he was arrested on charges of driving while suspended and unlawful delivery of marijuana within 1,000 feet of a school, by Officers Matthew Henderson, Brad Sutton, and Ken Feist, who were employees of the City of Beaverton Police Department. He further alleges he was wrongfully incarcerated and then released, with no charges filed by the Washington County District Attorney. He contends that as a result of the wrongful arrest, he has suffered financially and emotionally. He seeks a judgment of $80,000, plus court costs.

In support of the motion, Henderson and Sutton submit declarations offering details of the incident with plaintiff, along with various reports completed at the time. Those documents recite the following chronology of events:

On February 7, 2010, at approximately 1:33 p.m., Henderson was on routine patrol near SW 5th Street and SW Main Street, in Beaverton. Henderson Declr. at ¶ 2. He observed Roberts get out of the driver's side of a 1993 Honda, lock the door, and walk into a residence at 5020 SW Main Avenue. Id. Henderson made a routine check of the license plate on the car, which showed that Roberts's Oregon driver's license had been suspended "at the misdemeanor level."

2 - OPINION & ORDER

Id.

Henderson parked his patrol car so as to observe the location. Id. at ¶ 3. During the next ten to fifteen minutes, he watched approximately five different males come and go from the 5020 SW Main residence. Id. He thought one of those persons was Roberts. Id. Roberts appeared to head west, to a house across the street. Id. Some of the male individuals returned to the 5020 SW Main residence, but Henderson was unsure if Roberts was one of them. Id.

Henderson then observed another male roughly matching Roberts's description, leave the residence and get into the 1993 Honda. Id. at ¶ 4. The male individual drove the car northbound on Main, turned left, and headed west on SW 5th. Id. Henderson drove up behind the Honda in his marked patrol car and noted that the driver failed to completely stop at the intersection of SW 5th and SW Erickson Avenue. Id. Henderson then initiated a traffic stop and contacted the driver who identified himself as Theodore Goodpaster. Id. Henderson noticed an overwhelming odor of marijuana coming from the car. Id. He also noticed a marijuana pipe in the driver's door pocket. Id.

Upon Henderson's request, Goodpaster stepped out of the car. Id. at ¶ 5. Henderson asked if there was anything illegal in the car and Goodpaster responded that there was not. Id. Goodpaster then indicated that there might be a marijuana pipe and he gave Henderson consent to search the car. Id. Henderson found no marijuana in the car, but he noticed that the marijuana odor seemed to be coming from Goodpaster rather than the car. Id. He received Goodpaster's consent to search his person and found a small sack of marijuana in Goodpaster's waistband. Id.

Henderson advised Goodpaster of his Miranda rights and asked Goodpaster to explain what was going on. Id. at ¶ 6. After initially stating he did not know, Goodpaster then told

Henderson that Roberts asked Goodpaster to drive Roberts's car back to Roberts's house because Goodpaster had a driver's license. Id.

Henderson did not think that Goodpaster was telling him the whole truth, so he asked Goodpaster again to tell him the truth. Id. at ¶ 7. Goodpaster told Henderson that Roberts had seen the patrol car, was worried about getting into trouble for driving while suspended, and had left Goodpaster's house on foot. Id. Goodpaster was driving the car back to Roberts's house. Id. Goodpaster denied knowledge of the marijuana pipe being in the car. Id.

Gooodpaster also told Henderson that Roberts had given Goodpaster the marijuana in exchange for Goodpaster driving the car to Roberts's house. Id. at ¶ 8. Henderson asked Goodpaster to repeat that statement, and he did. Id. Goodpaster explained that Roberts had marijuana with him when he came into the house and he offered to give it to Goodpaster for driving the car back to Roberts's house at a later time. Id. Goodpaster also stated that he left the house shortly after Roberts had, and did not think that Henderson would be watching. Id.

During the time Goodpaster was talking with Henderson, Roberts walked up to the car and indicated he was the car's owner. Sutton Declr. at ¶ 2. Department of Motor Vehicles (DMV) records also identified Roberts as the car's owner. Id. Henderson placed Roberts in handcuffs and advised him that he was being detained under suspicion of having driven the car while having a criminally suspended driver's license. Id. at ¶ 3. Henderson had previously told Sutton that Roberts had parked the car in the area of SW 5th Street and Main Avenue. Id. Henderson read Roberts his Miranda rights and Roberts said he understood. Id. Roberts then told both Henderson and Sutton that he had driven from his apartment on Murray Boulevard to Goodpaster's home in the area of SW 5th and Main. Id.

4 - OPINION & ORDER

Roberts told Sutton that his driver's license had been "partially reinstated" and that he had a letter from the DMV showing days and times he was allowed to drive. Id. at ¶ 4. He further told Sutton that he had driven to Goodpaster's home to use his computer to look for a job because Roberts did not have a computer. Id. Roberts stated that he had permission to drive for purposes of using the Internet to look for a job. Id.

While Roberts and Sutton were talking, Sutton observed Roberts notice that Henderson had placed a small baggie containing a marijuana-type substance on the hood of the patrol car. Id. at ¶ 5. Roberts and Sutton were standing approximately twenty-five to thirty feet away from the baggie and it was difficult to see exactly what it was from where they were standing. Id. Roberts asked Sutton three or four times what was in the bag on the patrol car. Id. Roberts told Sutton he wanted to know what it was because he thought it was found in his car. Id. Sutton told him it had not been found in his car and Roberts stopped inquiring about it. Id.

Roberts, in response to a question by Sutton, denied that he used drugs, but he then stated that he occasionally used marijuana, just not in the last few days. Id. at ¶ 6. Upon request, Roberts voluntarily opened his mouth and allowed Sutton to look at it. Id. Sutton noticed signs, including a white and yellowish tongue, raised taste buds, and a very dry appearance, consistent with recent marijuana use. Id.

Sutton asked Roberts where he had come from when he walked up to the car during the traffic stop. Id. at ¶ 7. Roberts told Sutton that Goodpaster had called him, asking him to bring the insurance information to the traffic stop. Id.

Roberts was then arrested for the crimes of driving while suspended and distribution of a controlled substance within 1,000 feet of a school. Id. at ¶ 8; Henderson Declr. at ¶ 13.

5 - OPINION & ORDER

Contemporaneously with these events, Goodpaster completed a "Beaverton Police Department Statement Form" and a "Beaverton Police Department Signature Form." Exhs 2 & 3 to Henderson Declr. Both documents are dated February 7, 2011, and the Signature Form bears a time of 1400. Id. The Statement is sworn and signed by Goodpaster. Exh. 2 to Henderson Declr. Goodpaster recites that Roberts called to ask if he could come to Goodpaster's home to use the computer. Id. When he arrived, Roberts asked Goodpaster if Goodpaster could drive Roberts's car home for him because Roberts had seen a cop. Id. Roberts gave Goodpaster some pot to drive the car home for him. Id. Goodpaster started driving the car, saw a cop who followed him, and pulled him over. Id. The cop searched him and found the pot. Id. Goodpaster then told the cop how he obtained the pot. Id. Goodpaster affirmatively states that he was not forced "to do this" and "everything is true to my knowledge." Id.

In the Signature Form, Goodpaster checked a box indicating that he would testify as a witness against Roberts when Roberts is charged with a crime. Exh. 3 to Henderson Declr. The Signature Form contains information about initiating a false report and further states that initiating a false report is a Class C misdemeanor. Id.

The narrative reports completed by Henderson and Sutton at the time of the incident are consistent with the facts recited in their declarations. Exh. 1 to Henderson Declr; Exh. 1 to Sutton Declr.

In opposition to the motion, plaintiff submits a document entitled "Affidavit of Theodore Goodpasture [sic]." Attchmt to Pltf's "Answer" to Deft's Mtn for Sum. Judgmt. Not only is Goodpaster's name misspelled, the document is not a sworn statement and thus, does not constitute an affidavit. Mason v. Clark, 920 F.2d 493, 495 (8th Cir.1990) ("By definition an

6 - OPINION & ORDER

affidavit is a 'sworn statement in writing made . . . under an oath or on affirmation before . . . an authorized officer'") (quoting Webster's Third New Int'l Dictionary 35 (1965)); Kelly v. U.S. Bank, No. CV-08-1421-AC, 2010 WL 4135028, at *2 (D. Or. July 29, 2010) ("An affidavit is, by definition, a statement taken under oath") (citing Black's Law Dictionary 66 (9th ed. 2009)).

Nor can the unsworn document be considered a declaration. As Judge Acosta explained in a 2009 opinion:

> While Rule 56 refers specifically to affidavits, a party may also offer unsworn declarations in support of a motion for summary judgment provided the declarations comply with the requirements of 28 U.S.C. § 1746. Section 1746 requires that an unsworn declaration executed within the United States include language that "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct," as well as the date on which the declaration was executed.

Kesey, LLC v. Francis, No. CV-06-540-AC, 2009 WL 909530, at *6 (D. Or. Apr. 3, 2009) (citing 28 U.S.C. § 1746 (2007)). The document submitted by plaintiff does not contain the language from section 1746.

The misspelling and the lack of oath or appropriate declaration raise issues regarding the document's authenticity, Nonetheless, I consider the document because, as explained below, its contents do not create an question of fact on the relevant issue of probable cause.

In the "affidavit," Goodpaster states that on February 7, 2011[1], Roberts came to his house to use his computer to search for employment. Goodpaster "Affid." at p. 1. Goodpaster told Roberts he wanted to watch the Super Bowl at a friend's house, but he did not have a car. Id. Roberts offered Goodpaster the use of his own car, saying he could walk home because he did

---

[1] Presumably, this is a typographical error and Goodpaster intended to refer to February 7, 2010.

7 - OPINION & ORDER

not live far.  Id.

Goodpaster recites that Roberts left Goodpaster's residence and shortly thereafter, Goodpaster left driving Roberts's car.  Id.  According to Goodpaster, he was almost immediately stopped by Henderson for allegedly not coming to a complete stop at a stop sign at 5th and Main. Id.  Henderson asked for license, registration, and insurance information.  Id.  Because Goodpaster could not find the insurance card in the car, he called Roberts to ask where it was. Id.  Roberts told Goodpaster it was in the car and after looking further, Goodpaster found it.  Id. At this point, Goodpaster states, Roberts had begun walking to where Goodpaster was pulled over.  Id.

When Roberts arrived at the scene, Goodpaster was being searched by Henderson and Sutton who found a small amount of marijuana in Goodpaster's possession.  Id.  Goodpaster then recites the following facts:

> At this point, Officer Henderson asked me if I knew what kind of trouble I was going to be in.  I did not respond.  Officer Henderson then said that he believed I had been given the marijuana by Mr. Roberts.  I told him that Mr. Roberts had not given or sold me the marijuana.  Officer Henderson then began insisting that I was lying and that I had better tell him that Mr. Roberts had given me the marijuana or I was going to be in a lot of trouble.  I felt I had no choice but to tell Officer Henderson what he insisted I say, and that was that Mr. Roberts had given me the marijuana.
> I knew what I was telling Officer Henderson was not the truth, but he scared me into believing that I would be in a lot of trouble and would be arrested if I did not tell him that I received the marijuana from Mr. Roberts.
> I reluctantly told Officer Henderson that I had received the marijuana from Mr. Roberts.  Mr. Roberts was then arrested.

Id. at pp. 1-2.

Goodpaster then states that after receiving a subpoena to testify against Roberts before the grand jury, he retained an attorney who advised him that he "was not in any trouble yet," but that

8 - OPINION & ORDER

he would be in trouble if he perjured himself before the grand jury.  Id. at p. 2.  The morning of the grand jury, Goodpaster states he was approached in the hall by the Washington County Deputy District Attorney who asked him if his testimony was going to be that Roberts had given Goodpaster the marijuana.  Id.  Goodpaster told the Deputy District Attorney that he had not been truthful with Officer Henderson and that he would testify before the grand jury that he had lied, that the marijuana was his own, and that Roberts had not given or sold it to him.  Id.  Goodpaster states that at that point, the Deputy District Attorney told Goodpaster that his testimony would not be needed because he had no evidence to support the alleged crime.  Id.

Based on the allegations in the Complaint, it appears that the charges against plaintiff were not pursued by the District Attorney's office.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial."  Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation omitted).  The nonmoving party must go beyond the pleadings

9 - OPINION & ORDER

and designate facts showing an issue for trial.  Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material.  Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009).  The court views inferences drawn from the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  Long v. City & County of Honolulu, 511 F.3d 901, 905 (9th Cir. 2007).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

I.  Motion for Summary Judgment

The Complaint refers to no particular cause of action, but given that plaintiff filed the action in federal court, I presume, as does defendant, that he intended to assert a federal claim.  The relevant statute, 42 U.S.C. § 1983, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

42 U.S.C. § 1983.

"To state a claim under § 1983, a plaintiff must both (1) allege the deprivation of a right secured by the federal Constitution or statutory law, and (2) allege that the deprivation was committed by a person acting under color of state law."  Anderson v. Warner, 451 F.3d 1063, 1067 (9th Cir. 2006).

10 - OPINION & ORDER

Plaintiff fails to identify the particular federal right at issue. Based on the facts alleged in his Complaint, I assume he contends that his Fourth Amendment rights were violated by his arrest, which he suggests was without probable cause.

The only defendant named by plaintiff is the Beaverton Police Department. While a city or a county is considered a "person" under section 1983, a "police department" is not. Waggy v. Spokane County, 594 F.3d 707, 713 (9th Cir. 2010) ("Municipalities are considered 'persons' under 42 U.S.C. § 1983 and thus may be liable for causing a constitutional deprivation") (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978)); United States v. Kama, 394 F.3d 1236, 1239-40 (9th Cir. 2005) (Ferguson, J., concurring) (municipal police departments generally not considered "persons" within the meaning of section 1983). Thus, plaintiff has improperly named the Beaverton Police Department as a defendant.

Even if plaintiff amended his Complaint to bring the action against the City of Beaverton and/or the individual officers involved in the incident, defendant argues that summary judgment is appropriate because the evidence, considered in a light most favorable to plaintiff, shows that the officers had probable cause to arrest plaintiff. Additionally, defendant argues that plaintiff fails to establish any City of Beaverton policy, custom, or practice of unlawful arrests which is required to establish municipal liability.

"A warrantless arrest of an individual in a public place for a crime committed in an officer's presence violates the Fourth Amendment if the arrest is not supported by probable cause." Blankenhorn v. City of Orange, 485 F.3d 463, 470-71 (9th Cir. 2007); see also Cabrera v. Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998) (explaining that a plaintiff must show there was no probable cause to prevail on a section 1983 claim for false arrest).

11 - OPINION & ORDER

"The test for whether probable cause exists is whether at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the petitioner had committed or was committing an offense." Blankenhorn, 485 F.3d at 471 (internal quotation and brackets omitted); see also Dubner v. City & County of San Francisco, 266 F.3d 959, 966 (9th Cir. 2001) ("Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime").

Law enforcement officers may rely on their experience and expertise in determining probable cause. See United States v. Arvizu, 534 U.S. 266, 273 (2002) (holding that officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") (internal quotation omitted). The court examines events leading up to the arrest, and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotation omitted).

Defendant notes that in addition to what Henderson and Sutton observed, the officers relied on Goodpaster as a witness. Defendant argues that it was objectively reasonable for the officers to arrest plaintiff in light of the information they possessed and the witness's statements. I agree.

As to the drug charge, Henderson observed several male persons go in and out of Goodpaster's residence in a short period of time. He believed one of those persons was Roberts,

meaning that Roberts had stayed at Goodpaster's residence for a total of ten to fifteen minutes. Goodpaster smelled of marijuana. There was a marijuana pipe in Roberts's car. The bag of marijuana was found on Goodpaster.

At the time, Goodpaster's explanation to Henderson regarding Roberts delivering the marijuana to Goodpaster's residence and Roberts having given it to Goodpaster in exchange for driving the car back to Roberts's home, provided Henderson with probable cause to arrest Roberts on the drug charge. The testimony by Goodpaster, made after he received Miranda rights, after he had been asked to tell the truth, and then confirmed in a sworn statement at the time of the arrest, was consistent with Henderson's previous observations and acquired knowledge including watching Roberts enter Goodpaster's home after getting out of his car, watching several persons come and go from the home in a short time, noting that Roberts stayed only a short time, learning that Roberts had a suspended driver's license, and learning that Officer Sutton disbelieved Roberts's statements that Roberts had been looking for work on the Internet while at Goodpaster's home. Goodpaster's testimony, along with the other facts observed and acquired by Henderson gave Henderson facts sufficient to warrant a prudent person to conclude that Roberts violated O.R.S. 475.862 by delivering marijuana within 1,000 feet of a school.

Plaintiff suggests that Henderson should have known that Goodyear's statement was not reasonably trustworthy because Henderson somehow badgered Goodyear into fingering Roberts as the purveyor of the marijuana. However, Goodpaster makes no assertion that Henderson physically abused Goodpaster in any way or otherwise acted with an intent of extracting false information. While Henderson appears to have made Goodpaster feel uncomfortable and fearful of his own fate, the pressure Henderson allegedly applied on Goodpaster to state that the

marijuana belonged to Roberts does not, without more, create an issue of fabrication by Goodpaster. Additionally, the statement provided by Goodpaster was, as noted in the previous paragraph, consistent with the other facts Henderson independently acquired. Thus, Henderson had probable cause to arrest Roberts on the drug charge.

As for the driving charge against plaintiff, Henderson observed plaintiff get out of the driver's side door of a car, lock the door, and walk into the residence on SW Main. The license plate check of the car showed that Roberts had a suspended driver's license at the misdemeanor level. The only other information related to the driving charge that Henderson appears to have possessed before talking to Roberts or Sutton at the traffic stop, are the statements Goodpaster made indicating that Roberts asked Goodpaster to drive Roberts's car "back" to Roberts's house because Goodpaster had a driver's license. Goodpaster, at this point, did not expressly tell Henderson that Roberts had driven the car to Goodpaster's house and nothing in Henderson's affidavit or police report affirmatively establishes that Henderson himself had witnessed Roberts driving the car.

While Goodpaster was talking to Henderson, Roberts was talking to Sutton. Henderson then placed Roberts in handcuffs, advised Roberts he was being detained on suspicion of driving with a criminally suspended driver's license, and read him his Miranda rights. At this time, Henderson had a reasonable suspicion that Roberts may have driven the car with a criminally suspended license and thus, his investigatory detention pursuant to Terry v. Ohio, 392 U.S. 1 (1968), did not violate the Fourth Amendment. United States v. Johnson, 581 F.3d 994, 999 (9th Cir. 2009) ("Police may detain or seize an individual for brief, investigatory purposes, provided the officers making the stop have reasonable suspicion that criminal activity may be afoot")

14 - OPINION & ORDER

(internal quotation omitted). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." Id. (internal quotation omitted). "To determine whether reasonable suspicion existed, the court must consider the totality of the circumstances surrounding the stop." Id. (internal quotation omitted). "This determination is made with reference to the collective knowledge of the officers involved, and the inferences reached by experienced, trained officers" Id. (internal quotation omitted).

After detaining Roberts, there were subsequent discussions between Goodpaster and Henderson, Roberts and Sutton, and Henderson and Sutton. It was during these discussions that Roberts told Henderson and Sutton that he had driven the car from his apartment to Goodpaster's home. Roberts was then arrested on the driving and drug charges.

These facts raise the question of whether at the time Roberts told Sutton and Henderson that he had driven the car to Goodpaster's home, he was actually under arrest, in which case his statement about driving the car cannot be used to establish probable cause for that arrest, or whether he was still subject to the investigative Terry stop, allowing Henderson to rely on the statement to support a probable cause determination. While the question is close, I conclude that under the totality of the circumstances, the Terry stop had not yet ripened into an arrest when Roberts told Henderson and Sutton that he had driven the car.

Although the inquiry for determining whether an investigatory detention has ripened into an arrest is often noted to be whether a reasonable person would conclude that he or she was not free to leave, the standard is actually more nuanced than that. As the Ninth Circuit explained in a 2002 case,

15 - OPINION & ORDER

> [t]he standard for determining whether a person is under arrest is not simply whether a person believes that he is free to leave, . . . but rather whether a reasonable person would believe that he is being subjected to more than [a] temporary detention[.]" . . . Thus, whether an individual is in custody depends upon the objective circumstances of the situation, . . . or whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.

United States v. Bravo, 295 F.3d 1002, 1009 (9th Cir. 2002) (internal quotations, citation, and footnote omitted).

Here, while Roberts was handcuffed and had received Miranda warnings, he was also told that he was only being detained, not arrested, on suspicion of the driving charge. Handcuffing alone does not transform an investigatory stop into an arrest. Id. at 1010 (handcuffing is a substantial factor in determining if an individual has been arrested, but it is not determinative). Whether the suspect is transported to a different location is a relevant factor, as is the length of time of the detention. E.g., United States v. Place, 462 U.S. 696, 709 (1983) ("the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion"); United States v. Doe, 219 F.3d 1009, 1014 (9th Cir. 2000) (detention rose to an arrest when the defendant was moved to a locked detention cell).

The record discloses that the amount of time Roberts was detained as part of the investigatory stop was several minutes at most. He was not moved into the patrol car during that time or escorted to the police station. Given the evidence obtained by Henderson before Roberts's arrest, particularly in regard to Roberts's possession and distribution of marijuana, it was not unreasonable for Henderson to handcuff Roberts as a precautionary measure to prevent destruction or wasting of any drugs or drug paraphernalia that Roberts may have had on his

person, or to dissuade Roberts from fleeing. Under these facts, and the very short time that expired between the initial detention and arrest, Roberts was still under an investigatory detention that had not yet ripened into an arrest when he made his statement to Henderson and Sutton that he had driven the car to Goodpaster's. Thus, that statement, along with the other facts already known by Henderson and Sutton, may be relied upon to assess whether there was probable cause to arrest plaintiff for the driving charge.

In his own "affidavit," Goodpaster offers no evidence creating a genuine dispute over whether Roberts drove his car to Goodpaster's residence or whether Henderson observed Roberts get out of the car there. Goodpaster states that Roberts was lending Goodpaster his car for the day, that Roberts left Goodpaster's residence, and shortly thereafter, Goodpaster left driving Roberts's car. Even considering Goodpaster's "affidavit," the record still establishes that at the time of arrest, Henderson possessed facts and reasonably trustworthy information which would lead a prudent person to believe that Roberts had committed the crime of criminal driving while suspended under Oregon Revised Code § (O.R.S.) 811.182. Henderson had probable cause to arrest Roberts for the driving charge.[2]

As to any claim brought against the municipality, plaintiff must show that a City custom or policy caused a violation of his constitutional rights. Delia v. City of Rialto, 621 F.3d 1069, 1081 (9th Cir. 2010) (citing Monell, 436 U.S. at 690-91 (holding that a municipality is a "person" subject to damages liability under section 1983 where it has caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that

---

[2] Alternatively, because probable cause existed to arrest plaintiff on the drug charge, any lack of probable cause to arrest on the driving charge is immaterial.

17 - OPINION & ORDER

body's officers")), petition for cert. filed, 79 U.S.L.W. 3480 (U.S. Feb. 3, 2011) (No. 10-1018).

In Monell, the Court specifically rejected the use of the doctrine of respondeat superior to hold a municipality liable for the unconstitutional acts of its employees. Id. at 694. Rather, municipalities may be held liable only when an injury is inflicted by a city's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy[.]" Id. Additionally, while in some instances a single decision may subject a municipality to section 1983 liability, such liability "attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986).

Thus, to establish an official policy or custom sufficient for Monell liability, "a plaintiff must show a constitutional right violation resulting from (1) an employee acting pursuant to an expressly adopted official policy; (2) an employee acting pursuant to a longstanding practice or custom; or (3) an employee acting as a final policymaker." Delia, 621 F.3d at 1081-82. Here, even if plaintiff had established a violation of his Fourth Amendment rights, which he has not, he presents no facts in support of a Monell claim against the City of Beaverton, under any of the three recognized theories.

Finally, while it is most likely plaintiff intended to bring a section 1983 claim based on a Fourth Amendment violation, he may also have intended to assert a supplemental state tort claim for false arrest. However, the existence of probable cause is a complete defense to a false arrest tort claim. Rean v. City of Portland, No. CV-08-1403-KI, 2009 WL 5066758, at *12 (D. Or. Dec. 16, 2009) (citing Bacon v. City of Tigard, 81 Or. App. 147, 149-50, 724 P.2d 885, 886 (1986)). Defendant is entitled to summary judgment on any state law false arrest tort claim.

II. Motion to Amend

After defendant filed its Reply Memorandum in support of its summary judgment motion, plaintiff moved to amend his Complaint to add Henderson, Sutton, and Feist as individual defendants. The motion fails to comply with Local Rule 7-1 requiring that every motion contain a certificate of conferral with the opposing party, and importantly, the motion fails to comply with Local Rule 15-1(d)(1) requiring a copy of the proposed amended pleading to be attached as an exhibit to the motion to amend.

Nonetheless, even if the motion had complied with these rules, I would deny the motion. As explained above, the summary judgment record establishes that the officers had probable cause to arrest plaintiff, providing a complete defense to a section 1983 false arrest constitutional claim and a supplemental state false arrest tort claim. Any amendment to name the individual officers would be futile. The motion to amend is denied.

## CONCLUSION

Defendant's motion for summary judgment [#10] is granted. Plaintiff's motion to amend [#21] is denied.

IT IS SO ORDERED.

Dated this    18th    day of    April   , 2011


/s/ Marco A. Hernandez
Marco A. Hernandez
United States District Judge

19 - OPINION & ORDER